<u>**Not for Publication**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RAY MARSHALL, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | Civil Action No. 18-1344 (JMV) (JBC) |
| v. | <u>**OPINION**</u> |
| VERDE ENERGY USA, INC., | |
| *Defendant*. | |

<u>**John Michael Vazquez, U.S.D.J.**</u>

This putative class action alleges deceptive and bad faith practices that resulted in consumers paying more for electricity.  The initial Complaint, D.E. 1, was dismissed without prejudice, D.E. 48 ("First Opinion").  Plaintiff Ray Marshall then filed a First Amended Complaint (the "FAC"), D.E. 50, which was also dismissed without prejudice, D.E. 64 ("Second Opinion").  Presently before the Court is a motion to dismiss the Second Amended Complaint ("SAC"), D.E. 66, pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendant Verde Energy USA, Inc. ("Verde"), D.E. 68.  Plaintiff filed a brief in opposition, D.E. 73, to which Defendant replied, D.E. 74.[1]  The Court reviewed the parties' submissions and decided the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).  For the reasons set forth below, Defendant's motion to dismiss is granted in part and denied in part.

---

[1]  Defendant's brief in support of its motion to dismiss, D.E. 68, will be referred to as "Def. Br."; Plaintiff's opposition, D.E. 73, will be referred to as "Plf. Opp."; and Defendant's reply, D.E. 74, will be referred to as "Def. Reply."

## I.   BACKGROUND & PROCEDURAL HISTORY

The Court incorporates by reference the factual background and procedural history from the Second Opinion.  Here, the Court focuses on the new allegations added to the SAC.[2]  In New Jersey, a utility company cannot profit from buying and selling energy; it can only profit from delivery.  SAC ¶ 16.  Following energy deregulation in New Jersey, however, an independent energy supply company ("ESCO") can profit by buying and selling energy to customers.  *Id.* ¶ 17.  While ESCOs compete to supply energy services, local utility companies continue to actually deliver the supply.  *Id.* ¶ 18.  Local utility companies may also supply "metering, billing, and related administrative services to the consumer" regardless of whether an ESCO supplies the energy.  *Id.*

New Jersey has enacted legislation to regulate interactions among ESCOs and consumers.  A major component of the legislative scheme is a series of regulations, N.J.A.C. § 14:4-7.1, *et seq.*  *Id.* ¶ 38.  These regulations include provisions designed to police the content of ESCO marketing and contracts.  *Id.* ¶ 39.  One such regulation, N.J.A.C. § 14:4-7.6 (the "Pricing Regulation"), requires that the terms of service between an ESCO and a consumer provide "a clear and unambiguous statement of the precise mechanism or formula by which the price will be determined[.]".  *Id.* ¶ 42.

Defendant is an ESCO that supplies power to residents in New Jersey.  *Id.* at ¶¶ 2, 12.  Plaintiff decided to switch from his local utility, PSE&G, to Discount Power, an ESCO, because of Discount Power's representations that Plaintiff would save money on his electricity bill.  *Id.* ¶

---

[2] When reviewing a motion to dismiss, a court accepts as true all well-pleaded facts in the pertinent complaint.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  A court may also consider any document integral to or relied upon in such pleading.  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997)).  The SAC attaches two exhibits, which are considered in resolving the current motion.

54.  A few months after making the switch, Plaintiff was notified that his electricity service was being assigned from Discount Power to Defendant.  *Id.* ¶ 55.  Shortly after, Plaintiff received a "Welcome Letter" from Defendant, which stated that it "look[ed] forward to saving you money on your monthly electric bills in the months to come."  *Id.* ¶ 56, Ex. B.  The Welcome Letter adds that Defendant has "a strong focus on enabling our customers to save money on their monthly electric bills and in the past three years have helped our over 250,000 customers save an estimated $17 million on their bills."  *Id.*, Ex. B.  Plaintiff does not allege that the representation about past savings was false.

Defendant's Terms of Service for Discount Energy Group Variable Rate Customers (the "Terms of Service" or "Agreement") was contained on the back of the Welcome Letter. *Id.*¶ 57, Ex. B.  In the Terms of Service, Defendant explained that Plaintiff would "receive electricity from Verde at a variable generation rate."  *Id.*, Ex. A ¶ 1.  The Agreement added that "the rate may fluctuate monthly with market conditions."  *Id.*  The Agreement continued that Plaintiff "may compare price terms by looking at the rates posted on Verde's website and on Customer's monthly bill."  *Id.*[3]  The Agreement further directed Plaintiff to visit Defendant's website "for current rates and updates."  *Id.* ¶ 59, Ex. A. Plaintiff was also informed that his monthly electric bill would still be provided by PSE&G.  *Id.*, Ex. A ¶ 4.  Finally, the Agreement provided that either Plaintiff or Defendant "may cancel this Agreement at any time and for any reason without penalty."  *Id.*, Ex.

---

[3]  In the FAC, Plaintiff included a footnote that suggested various rates by PSE&G were drawn from the "Price to Compare" section of his bill.  *See* FAC ¶ 57 n. 6.  The Court inferred from this suggestion that PSE&G rates were listed alongside Verde's rates on Plaintiff's monthly bill. Second Opinion at 3, 9.  In his SAC, Plaintiff has amended that footnote to remove the reference to "Price to Compare."  Amended complaints supersede previous pleadings, even in the face of contradictory factual contentions.  *See West Run Student Housing Associates, LLC v. Huntington Nat'l Bank*, 712 F. 3d 165, 173 (3d Cir. 2013) ("[A]t the motion to dismiss phase, when the district court typically may not look outside the four corners of the amended complaint, the plaintiff cannot be bound by allegations in the superseded complaint.").

A ¶ 3.  Based on these representations, Plaintiff switched to Defendant for electricity in August 2012 and was placed on Defendant's variable rate plan.  *Id.* ¶ 62.  Plaintiff was a Verde customer from August 2012 to January 2018.  *Id.* ¶ 66.

> Plaintiff alleges the following:
>
>> A reasonable consumer . . . would understand that Verde's [v]ariable generation rates fluctuate in a manner correlated with the underlying PJM[4] market rate, and that, although prices would go up when wholesale prices rose, they would also go down when wholesale prices decreased, enabling customers to take advantage of market lows.

*Id.* ¶ 81.  Plaintiff continues that Verde's variable rate "failed to fluctuate in accordance with wholesale and retail electricity market pricing[.]"  *Id.* ¶ 64.  Plaintiff maintains that Defendant increased the rates charged to Plaintiff and class members when wholesale prices rose but kept prices level when wholesale prices fell.  *Id.* ¶ 87.  Plaintiff alleges that "there are numerous months where Defendant's rate was more than triple the wholesale rate."  *Id.* ¶ 80.  In addition, Plaintiff contends that Verde's rates were, at times, more than eighty percent higher than PSE&G's rates.  *Id.* ¶ 76.  PSE&G's rates, Plaintiff alleges, are reflective of market conditions because they are based on publicly held auctions.  *Id.* ¶ 73.  As a result, "Verde used its [v]ariable rates as a pure profit center."  *Id.* ¶ 87.  Of note, although Plaintiff asserts that PSE&G's rates are reflective of market conditions, PSE&G's rates were usually at least twice as high as the wholesale rate and often higher.  *Id.* ¶ 66.  Plaintiff also alleges that the Terms of Service failed to provide a clear and unambiguous description of the variable rate pricing mechanism, as required by the Pricing Regulation.  *Id.* ¶ 46.

---

[4] PJM is an independent, not-for-profit corporation formed in accordance with the recommendations of the Federal Energy Regulatory Commission.  *Id.* ¶ 28.  It determines the wholesale prices that will be paid for electricity through competitive bids.  *Id.* ¶ 30.

The SAC asserts the following claims: (1) violation of the Electric Discount and Energy Competition Act ("EDECA") and Retail Choice Consumer Protection Regulations, N.J. Stat. Ann. §§ 48:3-49, *et seq.*, for failure to adhere to advertising and marketing standards; (2) violation of the EDECA and Retail Choice Consumer Protection Regulations for failure to adhere to contract standards; (3) violation of the New Jersey Consumer Fraud Act ("CFA"), N.J. Stat. Ann. §§ 56:8-1, *et seq.*; (4) breach of contract; (5) breach of the implied covenant of good faith and fair dealing; and (6) violation of the Truth-In-Consumer Contract, Warranty, and Notice Act ("TCCWNA"). The first two claims are new to the SAC.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss when a complaint fails "to state a claim upon which relief can be granted[.]"  For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).  In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, not entitled to a presumption of truth.  *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011).  The Court, however, "must accept all of the complaint's well-pleaded facts as true."  *Fowler*, 578 F.3d at 210.  Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the

facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015).

### III. ANALYSIS

#### A. Whether the SAC Exceeds Scope of Permissible Amendment

In his FAC, Marshall obliquely raised an argument that Verde's conduct may have violated a New Jersey administrative regulation.  FAC ¶ 36.  He suggested that Verde's Terms of Service did not comply with the Pricing Regulation, which requires that the terms and conditions of an ESCO contract include "a clear and unambiguous statement of the precise mechanism or formula by which the price will be determined[.]"  *Id.*  He did not fully explain, however, how a violation of the Pricing Regulation impacted the analysis of his claims.  Noting that the Terms of Service could plausibly have violated the Pricing Regulation, the Court left open the possibility that Marshall could amend his pleadings to articulate a clearer theory of how a violation of the Pricing Regulation entitled him to relief.  *See* Second Opinion at 12-13.

In the SAC, Marshall asserts two new causes of action.  One is for violation of the Pricing Regulation (Count Two) and the other is for violation of a provision regulating marketing standards outlined in N.J.A.C. § 14:4-7.4 (the "Marketing Regulation") (Count One).  SAC ¶¶ 114-124.  He also amends to explain how these regulatory violations impact his CFA, breach of contract, breach of implied covenant of good faith and fair dealing, and TCCWNA claims.  *Id.* ¶¶ 125-186.

Verde argues that the Court should disregard Count I because its inclusion exceeds the scope of the leave to amend granted by the Court in the Second Opinion.  Def. Br. at 10.  It contends that the Court did not grant leave to amend for any reason other than explication of the impact of the Pricing Regulation, and the issues raised in Count I are unrelated.  *Id.*  It cites authority holding

that counts and claims exceeding the scope of a leave to amend may be perfunctorily dismissed. *Id.* The Court disagrees.  The Second Opinion, and accompanying Order, granted Plaintiff leave to file an Amended Complaint "consistent with [the] [Second] Opinion."  Second Opinion at 17. The Second Opinion did not grant leave to amend for the specific purpose of articulating the Pricing Regulation as Defendant contends.  Def. Br. at 10.

In the cases cited by Verde, leave to amend was either not granted at all or was expressly limited to a specific purpose. *See U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F. 3d 506, 524 (3d Cir. 2007) (regarding a plaintiff who neither sought nor received leave to amend a certain count); *Elansari v. United States*, Civ No. 15-1461, 2018 WL 575469, at *3 (M.D. Pa. Jan 26, 2018) (concerning a plaintiff who was permitted only to amend claims against one party); *In re Chemed Corp., S'holder Derivative Litig.*, Civ. No. 13-1854, 2017 WL 1712530, at *13 (D. Del. Apr. 25, 2017) (permitting the plaintiff only to submit an amended complaint addressing deficiencies of its duty of loyalty claim).  Here, by contrast, the Order accompanying the Second Opinion granted Plaintiff leave to amend and did not specify that Plaintiff could only amend certain claims.  D.E. 65.  Accordingly, the Court will now consider Count I and its related claims.

### B.  Whether the EDECA Contains a Private Right of Action

Both Count I and Count II claim that Verde violated administrative regulations promulgated pursuant to the EDECA.  Verde argues that there is no private right of action to enforce either regulation.  Def. Br. at 11-13, 19-20.

The EDECA was enacted in 1999 to allow for competition in energy markets. *See* N.J.S.A. § 48:3-50.  Expanding on that statutory scheme, the New Jersey Board of Public Utilities ("BPU") was authorized to enact specific regulations and licensing requirements, including advertising and contract standards. *See* N.J.S.A. § 48:3-85(a).  The BPU established regulations covering multiple

facets of the industry.  *See* N.J.A.C. § 14:4, *et seq.*  Counts I and II focus respectively on two of

these regulations: The Marketing Regulation and the Pricing Regulation.  Marshall claims that

violations of the Marketing and Pricing Regulations are *per se* violations of the EDECA.  SAC ¶¶

119, 124.  He further argues he is entitled to civil penalties for those violations pursuant to N.J.S.A.

§§ 48:3-82(a)(2) and 48:3-83.  SAC at 42.

Verde asserts that the Marketing Regulation can only be enforced only by the BPU.  Def.

Br. at 11.  This lack of a private right of action, Verde continues, is "confirmed" by a 2014

amendment to the EDECA, which led to the BPU's adoption of new marketing regulations.  *Id.*

(citing N.J.A.C. § 14:4-7.13(a)).  The new regulations, N.J.A.C. §§ 14:4-7.3(d) and 14:4-7.4(n)(1)

are privately enforceable pursuant to N.J.A.C. § 14:4-7.13(a)(1).  Verde's argument is that the

allowance of private remedies for these new regulations would have been unnecessary if the other

regulations, such as the Marketing Regulation, already provided a private right of action.  Def. Br.

at 12.  Verde also argues, generally, that the fact that the BPU is authorized to impose civil

penalties on non-compliant ESCOs indicates that the legislature intended the BPU to enforce the

regulations.  Verde makes similar arguments regarding the Pricing Regulation.  *Id.* at 19-20.  Verde

mentions in a footnote a relevant test under New Jersey law for whether there is an implied private

right of action.  *Id.* at 12 n. 5.

Although not analyzed by Plaintiff, New Jersey law employs the following analysis in

determining whether a statute creates an implied private right of action:

> To determine if a statute confers an implied private right of action,
> courts consider whether: (1) plaintiff is a member of the class for
> whose special benefit the statute was enacted; (2) there is any
> evidence that the Legislature intended to create a private right of
> action under the statute; and (3) it is consistent with the underlying
> purposes of the legislative scheme to infer the existence of such a
> remedy.

*R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 773 A. 2d 1132, 1143 (N.J. 2001). Here, the first factor appears to be met vis-à-vis Plaintiff, but the remaining considerations seem to be lacking.

Marshall responds that the regulations do grant a private right of action. He cites to a recent case from this District, claiming that it held consumers do have a private right of action under the EDECA. Plf. Opp. at 5-6 (citing *Little v. Ambit Energy Holdings, LLC*, Civ. No. 16-8800, 2017 WL 6559907 (D.N.J. Dec. 21, 2017)). He further claims that the legislative intent of the EDECA supports finding that there is a private right of action. *Id.* The Court does not agree that *Little* demonstrates consumers have a private right of action to enforce the Pricing and Marketing Regulations. That case also involved allegations that an ESCO overcharged consumers. The defendant sought to dismiss the plaintiff's CFA claim because the BPU had exclusive jurisdiction over conduct relating to energy supply. *Little*, 2017 WL 6559907, at *4. The court in *Little* concluded that the legislature did not intend the BPU to have exclusive jurisdiction. *Id.* The court did not discuss or analyze whether an individual could sue for violations of the regulations or related statutes. This Court, similarly, has never concluded that the existence of the EDECA precludes a suit under the CFA.

Marshall also cites to two provisions in the EDECA which purportedly grant him statutory damages for Verde's violations of the Marketing and Pricing Regulations. SAC at 42. These are N.J.S.A. §§ 48:3-83 ("Section 83") and 48:3-82(a)(2) ("Section 82").

Section 83 addresses violations of the EDECA. It provides:

> *Any person who violates any provision of this act shall be liable for a civil penalty* of not more than $5,000 for the first offense, except for a violation of section 37 of this act, for which a person shall be liable for a civil penalty of not more than $10,000 for the first offense, and not more than $25,000 for the second and each subsequent offense, for each day that the violation continues. *Any*

> *civil penalty which may be imposed pursuant to this section may be compromised by the board. In determining the amount of the penalty, or the amount agreed upon in compromise, the board shall consider:* the nature, circumstances and gravity of the violation; the degree of the violator's culpability; any history of prior violations; the prospective effect of the penalty on the ability of the violator to conduct business; any good faith effort on the part of the violator in attempting to achieve compliance; the violator's ability to pay the penalty; and other factors the board determines to be appropriate. *The amount of the penalty when finally determined, or the amount agreed upon in compromise, may be deducted from any sums owing by the State to the person charged*, or may be recovered, if necessary, in a summary proceeding pursuant to "the penalty enforcement law," N.J.S.2A:58-1 et seq. The Superior Court shall have jurisdiction to enforce the provisions of "the penalty enforcement law" in connection with this act.

N.J.S.A. § 48:3-83 (emphases added).

Section 82 provides additional remedies:

> (a) In addition or as an alternative, as the case may be, to revoking, suspending or refusing to issue or to renew the license of an electric power supplier or a gas supplier, *the board may*, after notice and opportunity for a hearing:
> …
>     (2) *Assess a civil penalty* pursuant to [N.J.S.A. § 48:3-82].

N.J.S.A. § 48:3-82(a)(2) (emphases added).

On their face, these provisions do not provide a private right of action. To the contrary, each statute makes clear that penalties are to be imposed by the BPU. Section 83 states that the BPU, not a consumer, shall weigh various factors in determining the penalty to impose in case of infraction. The implication that this remedy may be exercised only by the BPU is supported by the fact that the civil penalty may be deducted from sums owed by the State by the violator. Section 82 likewise makes clear that it is BPU who may levy penalties.

Verde contrasts these statutory civil penalties with the express private right of action set forth in N.J.A.C. § 14:4-7.13(a). That section reads as follows:

(a) In addition to any other penalties, fines, or remedies authorized by law, an electric power supplier, gas supplier, broker, energy agent, marketer, private aggregator, sales representative, or telemarketer that violates the provisions of N.J.A.C. 14:4-7.3(d)1 and 7.4(n)1 and collects charges for electric generation service or gas supply service from a residential customer who was subjected to false or misleading advertising or marketing claims by the electric power supplier, gas supplier, broker, energy agent, marketer, private aggregator, sales representative, or telemarketer in violation of the provisions of N.J.A.C. 14:4-7.3(d)1 and 7.4(n)1:

> 1. *Shall be liable to the residential customer in an amount equal to all charges paid by the residential customer after such violation occurs in accordance with any procedures as the board may prescribe*, whether the electric power supplier or gas supplier provided the electric generation service or gas supply service to that customer, or the electric generation service or gas supply service was provided to the customer by a broker, energy agent, marketer, private aggregator, sales representative, or telemarketer who contacted the customer on behalf of the electric power supplier or gas supplier; and

> 2. Shall be liable for a civil penalty pursuant to N.J.S.A. 48:3-83.

N.J.A.C. § 14:4-7.13(a) (emphasis added).

Section 14:4-7.13(a) provides that, in addition to the civil penalties in Section 83, an ESCO is liable directly to a residential customer for violations of specific regulations. Further, the regulation differentiates this liability from the civil penalties that the violator must face pursuant to Section 83. Neither the Pricing Regulation nor the Marketing Regulation contains the same or similar language. Further, the regulation segregates this liability from the civil penalties that the violator must face pursuant to Section 83.

In sum, the statutory scheme generally provides that remedies are limited to civil penalties levied by the BPU, with the exception of a limited series of remedies available to residential customers.[5]

Marshall also relies on a complaint filed in the New Jersey Superior Court which sought the imposition of civil penalties pursuant to Section 83.  Plf. Opp. at 15, Ex. A.  Marshall claims that the filing of this complaint led to a consent judgment.  The complaint is certainly not binding authority, and it is not a decision of any court.  Moreover, the complaint does not demonstrate that Marshall would have a private right of action.  The complaint was brought by the New Jersey Attorney General and the BPU.  Plf. Opp., Ex. A at 3-4.  The Attorney General has statutory authority to bring the CFA claims alleged in the complaint and the BPU has statutory authority to bring claims for violations of the EDECA.  The complaint is inapposite.

The only statutory analysis Plaintiff offers is of N.J.S.A. § 48:3-84(b), which notes that "administrative and judicial remedies provided in [the EDECA] may be pursued simultaneously."  Plf. Opp. at 6.  The court in *Little* relied on the provision in finding that the BPU did not have exclusive jurisdiction over potential CFA claims, but that is not the issue that Plaintiff presents.  In other words, Section 48:3-84(b) would be applicable if the Marketing and Pricing Regulations indicated that private consumers could bring a legal action in addition to the BPU's disciplinary authority.  Plaintiff's argument begs (rather than answers) the question – do the Marketing and Pricing Regulations provide a private right of action?

---

[5]  There appears to be an additional remedy.  N.J.A.C. § 14:4-7.4(o) provides that complaints related to a specific regulation regarding aggressive marketing tactics "shall be forwarded to the Division of Consumer Affairs for further investigation."  This regulation, however, also does not appear to grant a private right of action.

12

Ultimately, Marshall cannot point to any provision in the EDECA, its accompanying regulations, or any case law that grants residential customers a private right of action to sue for violations of the Pricing Regulation or the Marketing Regulation.  To the contrary, the regulations make clear that the BPU has authority to address any such violations.  The Court finds that no private right of action exists.  Counts I and II are accordingly dismissed.  Because there is no private right of action, the Court does not reach Verde's additional arguments that Marshall is not entitled to relief under the EDECA.

### C.  Whether Alleged EDECA Violations Affect Other Claims

While Marshall may not seek direct relief under the EDECA, he is not precluded from arguing that statutory and regulatory violations support his other claims.  Indeed, Marshall originally referred to Verde's alleged violation of the Pricing Regulation in the context of his breach of contract claim.  Marshall now claims that Verde's violation of the Pricing and Marketing Regulations renders his CFA, breach of contract, breach of covenant of good faith and fair dealing, and TCCWNA claims actionable.

#### 1.  CFA Claim (Count Three)

The CFA "seeks to protect consumers who purchase goods or services generally sold to the public at large." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 514 (3d Cir. 2006).  To state a CFA claim, a plaintiff must allege "(1) unlawful conduct; (2) ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007). Unlawful conduct is defined by the CFA as "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression,

or omission of any material fact with intent that others rely upon such concealment, suppression

or omission." N.J.S.A. § 56:8-2.

The Supreme Court of New Jersey has said the following concerning an unlawful practice

under the CFA:

> To violate the Act, a person must commit an "unlawful practice" as defined in the legislation. Unlawful practices fall into three general categories: affirmative acts, knowing omissions, and regulation violations. The first two are found in the language of N.J.S.A. 56:8-2, and the third is based on regulations enacted under N.J.S.A. 56:8-4. A practice can be unlawful even if no person was in fact misled or deceived thereby. *D'Ercole Sales, supra,* 206 N.J. Super. at 22; *Skeer, supra,* 187 N.J. Super. at 470. The capacity to mislead is the prime ingredient of all types of consumer fraud. *Fenwick v. Kay Am. Jeep, Inc.,* 72 N.J. 372, 378 13 (1977).
>
> When the alleged consumer-fraud violation consists of an affirmative act, intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act. *Chattin v. Cape May Greene, Inc.,* 124 N.J. 520, 522 (1991) (Stein, J. concurring). However, when the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent *is* an essential element of the fraud. *Ibid.*
> . . .
> The third category of unlawful acts consists of violations of specific regulations promulgated under the Act. In those instances, intent is not an element of the unlawful practice, and the regulations impose strict liability for such violations. *Fenwick, supra,* 72 N.J. at 376. The parties subject to the regulations are assumed to be familiar with them, so that any violation of the regulations, regardless of intent or moral culpability, constitutes a violation of the Act.

*Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (citation omitted). "Unconscionable

commercial practice," in turn, refers to a standard of conduct that implies a lack of fair dealing,

good faith, and honesty. *Id.* (citation omitted).

When a CFA claim is based on a valid, written contract, "a court will dismiss [the] claim

if the conduct alleged is "expressly authorized" by the terms of that contract. *Urbino v. Ambit*

*Energy Holdings, LLC*, No. 14-5184, 2015 WL 4510201, at *3 (D.N.J. July 24, 2015); *see also Hassler v. Sovereign Bank*, 374 F. App'x 341, 344 (3d Cir. 2010) (affirming dismissal of CFA where alleged wrongful conduct was expressly permitted by agreement at issue).  Moreover, when a CFA claim is based on a breach of contract, Plaintiff must allege a "substantial aggravating circumstance," demonstrating that the defendant's behavior "stands outside the norm of reasonable business practice in that it will victimize the average consumer."  *Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997); *see also Cox v. Sears Roebuck & Co.*, 647 A.2d at 462.  "Whether a business practice is unfair is a question for the jury, but if the claim is founded on written statements, then the court must make a legal decision whether the practice is unlawful in light of the writings."  *Urbino*, 2015 WL 4510201, at *3 (citing *Hassler*, 374 F. App'x. at 344).

In dismissing the CFA claim from the FAC, this Court concluded that Verde made no statements — in the Welcome Letter, Terms of Service, or elsewhere — that guaranteed Plaintiff any savings.  Second Opinion at 7-9.  The Court also concluded that Plaintiff had not pled any facts demonstrating substantial aggravating circumstances.  *Id.* at 9-10.  The SAC adds new facts bearing on the CFA claim, most of which relate to the Pricing and Marketing Regulations.  Plaintiff argues that violations of the Pricing and Marketing regulations are "proof of fraudulent and unconscionable conduct prohibited by the CFA."  Plf. Opp. at 18.

Plaintiff is correct that regulatory violations can comprise part of an actionable CFA claim. *See, e.g.*, *Pierre-Charles v. Consumer Portfolio Servs., Inc.*, No. 17-cv-10025, 2018 WL 3425737, at *4 (D.N.J. July 16, 2018).  Yet, as noted, only violations of regulations promulgated under the CFA give rise to strict liability under the Act.  *Cox*, 647 A.2d at 462.  Here the regulations at issue were not passed under the CFA.  But, as to substantial aggravating circumstances, Plaintiff asserts that failure to comply with the EDECA regulations means that Verde is acting outside of the norm

of reasonable business practices.  Plaintiff continues that acting outside of reasonable business practices is unconscionable, and unconscionable business practices constitute substantial aggravating circumstances.  Plf. Opp. at 20.  The Court agrees that the new allegations in the SAC – as to the Pricing and Marketing Regulations – sufficiently plead substantial aggravating circumstances to permit Plaintiff's CFA claim to go forward.

In reviewing the CFA, the Third Circuit has observed the following:

> The CFA is intended to "combat the increasingly widespread practice of defrauding the consumer." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 647 A.2d 454, 460 (1994) (quoting S. Comm., Statement to the Senate Bill No. 199 (N.J. 1960)) (internal quotation marks omitted). In enacting the CFA, the New Jersey Legislature intended to "give New Jersey one of the strongest consumer protection laws in the nation." *Id.* (citing Governor's Press Release for Assembly Bill No. 2402, at 1 (Apr. 19, 1971)). Therefore, its history "is one of constant expansion of consumer protection," *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 691 A.2d 350, 364 (1997), and it "should be construed liberally in favor of consumers," *Cox*, 647 A.2d at 461.

*Alpizar-Fallas v. Favero*, 908 F. 3d 910, 915 (3d Cir 2018).

Thus, for example, the New Jersey Supreme Court in *Cox* ruled that a contractor could be liable under the CFA after failing to get the necessary building and electrical permits, as required by CFA regulations.  *Cox*, 647 A. 2d at 463.  The Supreme Court reasoned that the regulations were in place to "prevent precisely the poor-quality work that characterized Sears' performance in this case and to protect consumers such as [the plaintiff.]"  *Id.*  Similarly, in *Artistic Lawn & Landscape Co., Inc. v. Smith*, 884 A. 2d 828, 832-33 (N.J. Super. Ct. Law. Div. 2005), the court found a violation of the CFA when a contractor's agreement with a homeowner did not comply with requirements of the relevant regulations.  Likewise, in *Bosland v. Warnock Dodge, Inc*., 933 A. 2d 942 (N.J. Super. Ct. App. Div. 2007), *aff'd* 964 A. 2d 741 (N.J. 2009), the court determined that the plaintiff had sufficiently alleged a CFA claim when she indicated that the defendant car

16

dealer had failed to follow the pertinent regulation when the dealer did not itemize a fee.  The foregoing cases involved regulations promulgated pursuant to the CFA, which is not the case here. Yet, the Court concludes that the Marketing and Pricing Regulations are nevertheless sufficient to support a claim pursuant to either an affirmative act or knowing omission theory.[6]

Plaintiff's new theory is that violations of the Pricing and Marketing Regulations are unlawful conduct under the CFA.  SAC ¶ 148.  Plaintiff makes a plausible allegation that Verde failed to comply with the Pricing and Marketing Regulations. The Marketing Regulation provides, in part, that "If a TPS[7] does not offer a fixed price or guaranteed price electric generation service or gas supply service, the TPS shall describe in clear and conspicuous language the mechanism or formula by which the price is determined, and provide a detailed customer bill comparison[.]" N.J.A.C. § 14:4-7.4(b)(2).  The Pricing Regulation requires that "if a fixed pricing arrangement is not made" in the terms and conditions of a TPS contract, "a clear and unambiguous statement of the precise mechanism or formula by which the price will be determined" must be included. N.J.A.C. § 14:4-7.6(b)(2).  Here, Plaintiff has plausibly pled that neither the Welcome Letter nor the Terms of Service complied with the regulations.[8]

---

[6] This ruling is limited to the current motion to dismiss.  If after conducting discovery, Defendant believes that neither theory is viable in light of the evidence, Defendant can revisit the issue if it so chooses.

[7] A "TPS" is a "Third party supplier" of electric power or gas supplier as defined in EDECA. N.J.S.A. § 14:4-1.2; N.J.A.C. § 14:4-7.1.  Defendant is a TPS.

[8] As to the Marketing Regulation, Plaintiff argues that the Terms of Service was initially a solicitation because he had seven days to opt out upon receipt.  SAC ¶ 61.  Defendant responds that this was not a solicitation, and Verde merely informed Plaintiff his provider was being switched.  However, Plaintiff's argument that it was a solicitation for the first seven days is plausible, which is sufficient at this stage.

Defendant argues that it has complied with the regulations by providing a "mechanism" by which the price will be determined because it explains the rate will be set on a monthly basis "with the ability to take market conditions into account."  Def. Brf. at 22.  Notably, Defendant provides no authority to support its argument.  The Terms of Service stated that Plaintiff would receive a variable rate and that "the rate may fluctuate monthly with market conditions."  The fact that a rate "may" fluctuate based on undefined "market conditions" does not reflect a "clear and unambiguous statement of the precise mechanism or formula by which the price will be determined."

Moreover, Defendants are not absolved by the fact that there was a written contract.  Failure to abide by the regulations was not "expressly authorized" by the Welcome Letter or Terms of Service.  Plaintiff has also plausibly alleged that it is unfair in light of the written statements.  The purpose of the regulations is to protect consumers from an ESCO's unfettered discretion in setting prices.  The regulations are also designed to inform a consumer, ahead of time, of the precise formula by which the consumer's rates will be determined.  One of the obvious benefits of the regulations is that the consumer will know how his/her rates are calculated and set.  Another benefit is that the consumer can protect him/herself if the ESCO deviates from its promised formula. Failure to abide by the regulations by setting forth an ambiguous pricing mechanism, and then attempting to use that failure to comply with the law as a shield to liability is not an argument that the Court accepts.  This case stands in stark contrast to the circumstances considered by the Third Circuit in *Hassler*, in which the complained-of conduct was expressly contemplated by a written agreement.  374 F. App'x at 344.  Neither the Welcome Letter nor the Terms of Service provided consumers with the required mechanism or formula by which Defendant set its prices.

Plaintiff has also sufficiently alleged that by failing to provide this required and critical information, Defendant was able to inflict the precise harm that Plaintiff suffered – being charged

entirely discretionary energy rates untied to any precise mechanism or formula.  Because Verde allegedly failed to comply with these regulations, Plaintiff was allegedly unable to protect himself from being subject to completely discretionary pricing.   This is the kind of harm that the CFA sought to abolish.

Given the remedial nature of the CFA, the fact that the CFA must be liberally construed to protect consumers, and the fact that it would be inappropriate for Defendant to benefit from its alleged violations of  Marketing and Pricing Regulations (by arguing that it did not violate its agreement with Plaintiff because it never promised Plaintiff a specific mechanism or formula by which price is determined), the Court finds that Plaintiff has pled a plausible claim under the CFA.[9]

### 2.   Breach of Contract (Count Four)

In the Second Opinion, this Court dismissed Marshall's breach of contract claim because he did not show that Verde breached any contractual obligation.  The Agreement did not require Verde to base its rates on market conditions.  Moreover, Plaintiff took an unduly restrictive view of the phrase "market conditions," and alleged only that Verde did not vary its rates according to certain comparable pricing, namely, PSE&G rates and wholesale costs.  Second Opinion at 10-13.  However, Marshall also argued that Verde's violation of the Pricing Regulation supported his breach of contract claim.  The Court invited Marshall to amend his complaint to explain how a

---

[9] The Court understands that there are other critical factual issues in this case.  For example, Plaintiff has failed to account for the fact that he was not locked into a long-term contract and could cancel without penalty.  Such issues could certainly impact causation or the amount of Plaintiff's alleged ascertainable loss.  Similarly, Plaintiff will ultimately have to *prove* that he suffered an ascertainable loss.  His citation to *Little v. Ambit Energy Holdings, LLC* is unavailing as to calculation of damages.  The plaintiffs in that case were harmed because the ESCO failed to disclose the actual amount that plaintiffs owed, not because the ESCO failed to disclose the means by which it would set its rates.  No. 16-880, 2017 WL 6559907, at *7 (D.N.J. Dec. 21, 2017).  Those issues, however, are factual and will be subject to discovery.

violation of the Pricing Regulation would impact this claim—if, for example, it rendered the contract void or voidable. *Id.*

Marshall has not done so. He makes no claim or argument that the contract was void or voidable, or otherwise impacted by an alleged violation of the Pricing Regulation. Instead, he essentially repeats the same allegations which have previously been rejected by the Court. The only new argument Marshall makes in his opposition is that the two cases cited by Verde in its newest motion to dismiss are distinguishable. Plf. Opp. at 25-27. This argument, however, has no bearing on the fact that Marshall alleges no new facts that overcome the deficiencies pointed out at length in the Second Opinion, or any explanation of how regulatory violations might salvage the breach of contract claim.

Marshall has had three opportunities to plead facts giving rise to a breach of contract claim yet continues to raise the same rejected arguments.[10] Accordingly, Count Four is dismissed.

### 3. Breach of Implied Covenant of Good Faith and Fair Dealing (Count Five)

As discussed in the Second Opinion, Plaintiff may bring a claim for breach of the implied covenant of good faith and fair dealing in the alternative to his breach of contract claim. Second Opinion at 13-14. The SAC now alleges that Defendant's violation of the Pricing and Marketing Regulations demonstrates that it has violated "community standards of decency, fairness, and reasonableness." SAC ¶ 176.

Verde argues that this new, regulatory theory cannot support a breach of implied covenant claim because it concerns "the formation of – not Verde's *performance* under – the Terms of

---

[10] Plaintiff does not argue (or cite any pertinent authority), for example, that the applicable regulatory requirements were incorporated into his contract, and that Verde accordingly violated them.

Service." Def. Br. at 30.  Issues of contract formation, Verde explains, cannot support breach of implied covenant claims. *Id.* at 29 (citing *Robinson v. Wingate Inns Int'l Inc.*, No. 13-2468, 2014 WL 4952363, at \*3 (D.N.J. Sept. 24, 2014).  Marshall counters that the regulatory violations, to Marshall, serve as "evidentiary support for a reasonable inference of Defendant's bad faith in the performance of the contract[.]"  Plf. Opp. at 27.

The covenant applies in both the performance and enforcement of a contract.  *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assocs.*, 182 N.J. 210, 224 (2005).  "Good faith conduct is conduct that does not violate community standards of decency, fairness or reasonableness."  *Id.* (quotations omitted).  "Proof of 'bad motive or intention' is vital to an action for breach of the covenant." *Id.* at 225 (quoting *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001).

The Court agrees that a violation of the Marketing and Pricing Regulations can be viewed as related to performance under the Terms of Service.  The ambiguity of the pricing term set the parameters which allowed Verde, in Plaintiff's view, unfettered discretion[11] to charge whatever it wished.  Verde's failure to comply with the regulations is what permitted Verde, according to Plaintiff, to charge Plaintiff whatever Verde wanted – unmoored from any specific pricing formula or mechanism – and Plaintiff experienced the adverse consequences in the performance of the

---

[11] Verde also argues that it was not required to use a specific formula or mechanism in setting Plaintiff's monthly variable rate, meaning that all Verde had to do was use *any* specific formula or mechanism of its choosing.  But this argument misses the point.  Assuming the veracity of Plaintiff's arguments, Verde may have had a "formula" which indicated that it would not lower a customer's prices if wholesale costs dropped but that Verde would raise its rates a certain percentage whenever wholesale costs increased.  Such a "formula," assuming that it passed regulatory scrutiny, may very well comply with the Marketing and Pricing Regulations.  At the same time, such a pricing mechanism would have alerted a potential customer that he/she could not expect any actual savings in using Verde.  Moreover, Plaintiff has plausibly alleged – given Verde's rate variations over time – that no specific formula was ever used by Verde, which would be a violation of the relevant regulations.

parties' agreement.  Further, Verde's alleged violation of the Pricing Regulation permits a reasonable inference that it acted in bad faith.  The motion to dismiss this count is denied.

### 4.  TCCWNA (Count Six)

Plaintiff's TCCWNA claim is again premised on the CFA violation.  Marshall argues that this claim should survive because has sufficiently pled a CFA violation.  Plf. Opp. at 16.  Verde argues that because the CFA claim should fail, this claim should fail along with it.  Def. Br. at 30.  Because the CFA claim may proceed, the TCCWNA claim may proceed as well.

### IV.  CONCLUSION

For the reasons stated above, Defendant's motion to dismiss, D.E. 68, is granted in part and denied in part.  Defendant's motion is denied except for its motion as to Counts One, Two, and Four.  An appropriate Order accompanies this Opinion.

Dated: October 5, 2020

John Michael Vazquez, U.S.D.J.